ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

LINA PENG (NYBN 5150032)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7027
    Lina.Peng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>SAMUEL HOLQUIN,<br><br>    Defendant. | NO. CR-22-463<br><br>UNITED STATES SENTENCING MEMORANDUM |

Through his actions of witness retaliation, as well as lies afterwards when questioned by law enforcement, Holquin attempted to undermine the integrity of the judicial process. Doing so in the context of a prosecution of RICO conspiracy and VICAR murder by a criminal enterprise whose modus operandi was fear and intimidation and against a critical witness *in the middle of trial* underscores the pervasiveness of the "no snitching" culture of that enterprise and highlights the need for general deterrence. Actions like that of Holquin's, and particularly in the context of a case carefully followed by other Hells Angels members and associates, must be deterred in the strongest terms. A meaningful prison term is necessary to achieve the sentencing goals of general deterrence, promote respect for the law, and provide just punishment. The government recommends a prison sentence of 9 months, followed by three years of supervised release.

# BACKGROUND

## I. Offense Conduct

On April 11, 2022, a jury trial began in *United States v. Nelson et al*, 17-CR-533 EMC (N.D. Cal). Three defendants—Jonathan Nelson, Brian Wendt, and Russell Ott—members and associates of the Sonoma charter of the Hells Angels ("HASC")—were charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), conspiracy to murder Joel Silva, former member of HASC, in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), and murder of Silva in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). Nelson was also charged with assault in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3), and use/possession of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The government presented evidence at trial that HASC engaged in witness tampering to dissuade witnesses and victims from testifying about HASC's criminal activities. On June 22, 2022, the jury returned a verdict of guilty on all counts.

During the trial, the government called witness J.H. to testify. J.H. was a former member of the Richmond charter of the Hells Angels, and he provided critical testimony regarding the murder of Silva, including how the plot was hatched and a confession by Wendt. J.H. provided testimony on May 2, 2022, and May 3, 2022, including being cross-examined by the defense. J.H. was recalled and testified again on June 8, 2022. Due to the COVID-19 pandemic limiting public viewing in the courtroom, the court permitted the public to listen to the proceedings via a tele-conference line.

On May 10, 2022, Holquin contacted J.H. via text message. The text messages included photographs of J.H.'s family, including his mother and wife, and identified where J.H. was living at the time. J.H. reported the contact to the Federal Bureau of Investigation (FBI).

On May 11, 2022, the FBI interviewed Holquin. In that interview, Holquin stated, among other things, that he was still good friends with J.H. and he does not understand why J.H. would not talk to him. Holquin stated that he reached out to J.H. because he wanted to see him. Holquin stated that he heard that J.H. was going to court and that Holquin did not know why J.H. was going to court, though Holquin assumed it was to testify but he did not know what about. Holquin reiterated that he wanted to hang out with J.H., that J.H. had no reason not to talk to him, and that he bore no ill will towards J.H.

On May 13, 2022, the FBI interviewed Holquin a second time. In that interview, Holquin stated,

among other things, that he had no ill will towards J.H. and that he knew J.H. was going to court but he had no idea what it was for. Holquin stated that he sent J.H. photos of J.H. and J.H.'s father to "make sure it's him" and that he told J.H. to tell his mother that she looks good. Holquin also stated that he had already deleted the text messages that he sent to J.H.

In his interviews with the FBI, Holquin stated, among other things, that Silva and J.H.—both former Hells Angels members—were good friends of his, that he associated and still associates with the Hells Angels and was friends with "a lot of the guys," including Damien Cesena and Timothy Bianci, that he sold weed with Silva and believes that Silva and J.H. stole weed from him, that he attended Russell Ott's 40th anniversary party in Fresno and met Brian Wendt, Robbie Huff, Merl Hefferman and Tiofilo Bueno.[1] Holquin also indicated that he was familiar with how the Hells Angels conducted business, including that he would not question them or they would come looking for him and that he would not seek prosecution against them even if he was a victim. For instance, Holquin stated that he would not tell a Hells Angel that another member killed someone because they would "not leave [him] around." Holquin stated that he was told that Silva had been kicked out of the club, and that later Jeremy Greer also got kicked out of the club.

On May 16, 2022, the FBI executed a search warrant on Holquin's cellphone, authorized by Honorable Joseph C. Spero, United States Magistrate Judge. Review of the contents of Holquin's cellphone pursuant to that warrant showed the following, among other things:

    a. Holquin had not deleted his text messages to J.H.

    b. Holquin forwarded the texts he had sent to J.H. with the photographs of J.H.'s family to another individual with the messages "this is what I sent to that piece of shit," "yeah he's a fucken bitch . . . I was kind of hoping he would at least have the balls to respond but once I said who I was he obviously stopped and didn't respond lol. But he was bragging in court about how bad he was," and "I had to let him know that I found him and know everything about him and his family."

    c. Holquin texted another individual, "[J.H.] that fucken rat mother fucker who clearly

---

[1] As the Court heard during the presentation of evidence, each of these Hells Angels played important roles in the murder of Joel Silva.

turned bitch. I might as well drive out there and get all 3 of them fucken pieces of shits."

    d. Prior to J.H.'s testimony, Holquin texted a third individual with the link to the court's public tele-conference line for the trial with the message "here's the website that has the info . . . passcode is down at the bottom." When asked if anything happened that day, Holquin responded "yeah, they're talking about that piece of shit [J.H.] that I used to hangout with all the time . . . he's wto [sic] testify either Friday or Monday" and "fucken. Rat mother fucker."

    e. Prior to J.H.'s testimony, Holquin texted a fourth individual, indicating that he was "going to listen to hear what that piece of shit says," and that he hoped that the defense cross examination of J.H. would "rattle" J.H. Holquin further stated "[h]e's to [sic] fucking arrogant but we'll see," and in reference to information Holquin had provided to the defense, Holquin stated, "[h]e's definitely going to be shocked that they know as much about his punk ass."

On December 7, 2022, the grand jury indicted Holquin with two counts of witness retaliation, in violation of 18 U.S.C. § 1513(b)(1) and 18 U.S.C. § 1513(e), and two counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2), in connection with his interviews with the FBI on May 11, 2022, and May 12, 2022—both in the middle of the first *U.S. v. Nelson* trial.

On July 27, 2023, Holquin pleaded guilty to one count of witness retaliation, in violation of 18 U.S.C. § 1513(e). In so doing, Holquin admitted that he knowingly took actions harmful to J.H. with the intent to retaliate against him for providing truthful information to a law enforcement officer related to the commission or possible commission of a federal offense, and that Holquin knew that J.H. was a material witness for the government at trial in *United States v. Nelson et al*, 17 CR 533 EMC (N.D. Cal.), a criminal prosecution against the members and associates of the Sonoma charter of the Hells Angels.

## II.    Guidelines Calculation

The government is in agreement with the Guidelines calculation in the PSR, including the additional two-point deduction under the new Guidelines provision U.S.S.G. § 4C1.1(a)(2) for zero-point offender.

Accordingly, the government agrees with that the total offense level, after adjustments, is 10 and that the applicable Guidelines range is 6 to 12 months at criminal history category I.

## DISCUSSION

### I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991. In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), to include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### II. The Sentencing Factors Call for a Guidelines Prison Sentence in This Case

A prison term is necessary to achieve the statutory sentencing goals in this case; a term of probation is simply insufficient. The government recommends a custodial term of 12 months and 1 day, followed by 3 years of supervised release.

First, the nature of the criminal conduct is extremely serious and undermined the integrity of the judicial process. The Court is well aware, having sat through five months of evidence in two separate trials, of the seriousness of the criminal conduct of HASC, the real fear and reluctance of the witnesses who testified at trial, and the extreme violence and intimidation directed by HASC at those who dared to cross them let along testify against them. The pattern of witness intimidation was proven at trial, including through the testimony of witnesses who were threatened by violence to stay quiet such as Javad Trew, Jamie King, Mariano Malvino, Dylan Ghaderi, Taylor Blanford, and Michelle Conte. The

evidence at trial proved that the "no snitching" rule was so foundational to the HASC that those anyone who was around them or interacted with them understood that there was to be no talking to law enforcement.  The pervasiveness of that ethos, enforced by the threat of violence, is what gave the criminal enterprise power and allowed them to get away with crimes that went unreported.  Holquin, as an admitted associate of the HASC, understood these rules.  Although Holquin did not engage in physical violence in this offense, his actions were nevertheless extremely serious because of the direct interference with the judicial process, in the middle of the trial, and against a critical witness.

Holquin's texts to other individuals discussing the texts he sent to J.H. present an accurate picture of Holquin's intentions.  He was closely following the trial, and he saw J.H. as a "rat mother fucker" and wanted J.H. to be rattled during his testimony, including by threatening J.H.'s family.  Holquin wanted J.H. to be scared.   His threats were designed to make J.H. fearful for his own life and the lives of his family, and they carried with them, as Holquin himself texted, an implicit threat of physical harm (""[J.H.] that fucken rat mother fucker who clearly turned bitch.  I might as well drive out there and get all 3 of them fucken pieces of shits.").  As such, it is no mitigation to say that Holquin actually did not physically harm J.H.—if he had, the crime and the corresponding Guidelines would be substantially different.

Moreover, the fear and intimidation experienced by J.H., including through Holquin's actions, contributed to J.H. not wanting to testify in the second trial.  As the Court knows, J.H. had to be arrested before he testified.  If J.H. had not been found and arrested in time, the government's case would have become significantly more challenging with respect to the Silva murder.  Moreover, Holquin not only intimidated J.H. directly but spread word about his intimidation proudly to others, further exulting the "no snitching" culture and encouraging future such conduct to make prosecutions more difficult.  In short, in terms of the spectrum of witness retaliation crimes, Holquin's actions rank among the more serious.

Second, the most important sentencing factor in a case like this is general deterrence.  The cost of a successful act of witness intimidation—including some of the events the Court heard about during trial—is a subversion of the justice system and leaving victims with no redress.  While it is true that J.H. ultimately ended up testifying despite his fears and anxieties and after being arrested, general deterrence

in an atmosphere of a violent criminal enterprise requires a meaningful prison sentence. This is particularly the case for individuals similarly situated to Holquin. That is, individuals who are in the HASC's orbit and sway may feel emboldened or incentivized to gain their favor by intimidating witnesses who could testify against their members. The Court saw this with the Jamie King assault and the subsequent church meeting where HASC members specifically discussed whether anybody knew someone who could get to the witnesses—and King in fact was successfully intimidated into silence and did not testify in the state case. The ability of HASC to wreak violence and fear without repercussion is dependent on an entire eco-system compromising of associates like Holquin. General deterrence in this case is paramount, particularly because cases of successful intimidation will never see the light of a courtroom and exact a significant cost to society. As the Court knows, the *Nelson* trials have been closely followed by HASC and its associates and by the Hells Angels community in general. The message that the Court sends through its sentence in this case will be heard loud and clear.

Relatedly, the government acknowledges that Holquin, besides two arrests, has no reported criminal history. But that fact alone is not reason for a non-custodial sentence. The Guidelines have already taken into account his lack of criminal history through his criminal history category and in affording him the newly promogulated additional two-point reduction from his total offense level. There is no basis to further vary downwards. While it may be true that Holquin himself may not reoffend in the same manner, a meaningful custodial sentence is necessary to achieve the other statutory goals of sentencing of promoting respect for the laws and general deterrence.

## CONCLUSION

The government recommends that the Court impose a custodial sentence of 9 months in custody, followed by 3 years of supervised release.

DATED: February 15, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

      /s/
LINA PENG
KEVIN BARRY
Assistant United States Attorney